1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

ROBERT ALAN BAILEY,

     Plaintiff,

v.

FRAN ABRAMO; et al.,

     Defendants.

2:06-cv-0639-LDG-LRL

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

     This cause having come on for hearing before the Honorable Lloyd D. George, District Judge, on the 5th day of April, 2010, plaintiff Robert Alan Bailey being present, LeeAnn Phouthavongsay, Deputy Attorney General of the State of Nevada, and Rona-Kaye Tuitele, Deputy Attorney General of the State of Nevada, being present on behalf of defendants Celia Chacon, Ted D'Amico, Joseph Ferro, Rogelio Herrera, Robert LeGrand, Patricia Leonhardt, John Macinnis, David Peden, William Sandie, and John Scott, and the court having considered the matter, including arguments of counsel, the evidence adduced at trial, and the documents on file herein, now therefore, the court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

     1.     Plaintiff Robert Alan Bailey was incarcerated within the Nevada Department of Corrections ("NDOC") under inmate BAC #75226 from approximately March 2002 to November 2009. The claims set forth in plaintiff's second amended complaint are based upon the conditions

of his confinement and alleged violation of his rights under the United States Constitution while housed at Lovelock Correctional Center ("Lovelock") located in Lovelock, Nevada.

2.     In November 2009, plaintiff was released from NDOC custody following the expiration of the term of imprisonment for which plaintiff was sentenced in 2001 for his underlying criminal convictions.  Plaintiff, who had proceeded in proper person since the inception of this case, represented himself and presented his case in chief without the assistance of counsel.

3.     The record indicates that on March 31, 2010, during a pretrial hearing in this case, Chief Judge Roger Hunt ruled that responses to discovery requests and excerpts from the internet and publications could be used at trial only during cross-examination and impeachment, but are not admissible as evidence.  Chief Judge Hunt further ruled that for grievances to be admitted, plaintiff would be required to have another witness testify that they were prepared by plaintiff, and to whom they were delivered, etc., before they would be admissible.  Chief Judge Hunt also denied plaintiff's petitions for writs of habeas corpus ad testificandum for lack of supporting affidavits indicating what the testimony is, why it is necessary and why the probative value of the testimony outweighs the expense and security risks involved.  Chief Judge Hunt ruled that, regarding plaintiff's claim that he was denied the right to speak with the individuals or obtain their affidavits, plaintiff would likely be permitted to testify that he was refused permission to do so.

4.     Shortly before the start of trial, this court ruled that plaintiff had failed to timely subpoena the defendants, who were not present during his case.  However, plaintiff was permitted to testify during trial regarding certain admissions made by defendants.

5.     During the presentation of his case, plaintiff testified that his underlying criminal convictions for burglary (felony) and attempted kidnapping in the first degree (felony) were the result of what plaintiff characterized as his "obsessive personality."  Plaintiff, an avid comic book collector, testified that while he resided in Reno, Nevada, comic books valued at $100,000 had

2

been stolen from him, and that he had made repeated requests to law enforcement and government authorities for an investigation into the alleged theft, which requests went unanswered.  Plaintiff testified that the police told him that no assistance would be given because the police had not concluded that a crime had been committed.  Accordingly, plaintiff vowed that "[I]f they want a crime, I'll give 'em a crime."

6.      Plaintiff further likened his then state-of-mind to that of a "dog with a bone to pick," and following plaintiff's private investigation and ultimate location of his comic books at a local comic book store, plaintiff approached the store on March 22, 2001, and attempted to take the female owner hostage by use of a stun gun and handcuffs.  A scuffle ensued and the female owner managed to escape and call for help.  Plaintiff then barricaded himself in the store with a homemade explosive devise consisting of 3500 firecrackers, lamp oil, and multiple bottles of propane.  After negotiating with local law enforcement officials, plaintiff eventually surrendered.  He was thereafter charged with, and pleaded guilty to, the aforementioned crimes.

7.      Plaintiff testified that he entered the NDOC system with pre-existing mental health issues, admitting that prior to his detention in the county jail during the course of his criminal case, he was neither taking prescribed medication nor consulting a mental health counselor to address these mental health issues.  Upon admission to county jail, plaintiff was administered Prozac for his mental health condition, which medication was continued upon admission into the NDOC system in late 2001.

8.      During his testimony, plaintiff conceded that he was systematically provided with his dosages of Prozac for the duration of his tenure with NDOC from 2002 to 2009, with the exception of June 22, 2004, and November 29, 2004.  Plaintiff also conceded that as a result of the consistent administration of the Prozac, he was "stabilized" in prison and consequently, "pretty mellow."

3

9.     On June 22, 2004, the unit in which plaintiff was housed was in lockdown status due to safety and security concerns.  While the inmates in plaintiff's unit were not free to go to pill call to obtain their daily medication, the inmates were personally provided their respective medication by a nurse and an accompanying correctional officer, who administered pill call in the unit by approaching each respective inmate's cell with their medication, and provided the medication only if the inmate was appropriately dressed with his identification card in hand.  If an inmate was not ready to receive his daily medication during pill call, the nurse would wait for an appropriate time, and then proceed to the next cell for pill call.  Plaintiff testified that, in this instance, the nurse did not approach his cell to administer his daily dosage of Prozac.

10.     Plaintiff further testified that, after he realized the nurse had left his unit without providing him with his daily dosage of Prozac, he notified Correctional Officer David Peden.  Plaintiff indicated that Officer Peden called the medical unit to inquire about plaintiff's medication, after which plaintiff was informed that no make-up pill call would be permitted, and that plaintiff would not receive his Prozac on that day.

11.     Thereafter, from June 22, 2004, to September 13, 2004, plaintiff stated that he filed inmate requests and grievances 1) requesting the missed Prozac dosage, 2) seeking an explanation for the missed Prozac dosage, 3) informing the custody and medical staff of the alleged violation of his constitutional rights, and 4) informing the same of his intent to file suit against the NDOC.  Based on the prior evidentiary ruling of Chief Judge Hunt, however, plaintiff was not permitted to introduce these documents into evidence.  Plaintiff conceded that prison officials responded to his grievances by informing him that one missed dosage of Prozac was not serious or life-threatening, and therefore, plaintiff would not be injured by the missed dosage regardless of the reason that he may have been skipped by the nurse.  Plaintiff testified that he was dissatisfied with these responses, causing anger and obsession to "build up in [his] mind" about the missed-dosage incident.

4

12.     On September 15, 2004, plaintiff was treated at, admitted to, and later released from the LCC infirmary after threatening to jump off of the second tier of his unit if he was not immediately provided medical care for a skin rash that was ultimately diagnosed as Shingles. Beginning on September 15, 2004, plaintiff was provided medical treatment for the Shingles, which included anti-itch medication and shots of pain medication.  Plaintiff testified that he was systematically provided with daily dosages of Neurontin to treat the pain associated with the Shingles, which was administered beginning approximately September 18, 2004.

13.     On or about September 21, 2004, plaintiff incurred a notice of charges by the female psychiatric nurse arising out of an incident in which plaintiff, during a follow-up consultation and referral for anger issues, pulled his pants down and exposed his genitals while describing his emotional state, and thereafter refused to pull his pants up.  Plaintiff contended that he was merely relaying what occurred during an incident on September 18, 2004, in which plaintiff was handcuffed and being escorted outside his unit, and his pants fell down because he did not have a belt, at which time the escorting guards bounced him up and down "like a sack of potatoes" while trying to pull his pants up, causing the brief exposure of plaintiff's genitals before he was clothed.  Plaintiff testified that he became extremely frustrated and angry over the incident, which was one of the reasons for his referral to the psychiatric nurse for a consultation.

14.     Sometime between September 15 and September 22, 2004, plaintiff possessed photographs of his nude upper body which he claimed were taken at the canteen to document the existence and extent of his condition at the time.  Plaintiff testified that on or about September 22, 2004, some of the photographs of plaintiff's nude upper body were confiscated after plaintiff was transported to disciplinary segregation as a result of the charges filed by the psychiatric nurse. Plaintiff had attached these same to a grievance that was submitted to authorities.  Plaintiff was informed by prison officials that photographs depicting a nude body, either in whole or in part, constituted contraband and as such, plaintiff was not permitted to keep the photographs of his

nude upper body in his possession. Plaintiff was further informed that the photographs of his nude upper body were improperly taken by an inmate working in the canteen, who was not permitted to take such photographs.  At trial, plaintiff introduced three of the aforementioned photographs as exhibits that he kept from prison officials, which the court admitted and received into evidence as plaintiff's exhibit #1 over defendants' objection.

15.     On or about November 12, 2004, plaintiff testified that his unit was placed on lockdown status due to internal conflicts between various gangs within the institution, and that for the following sixteen (16) days he received his daily dosages of Prozac and Neurontin while his unit was on lockdown status, except that on November 29, 2004, plaintiff did not receive his morning dosage of Prozac and Neurontin as morning and lunch pill calls were cancelled.  Plaintiff, however, was administered the Neurontin during evening pill call that same night, and the Prozac, which plaintiff received once a day in the morning, the following morning on November 30, 2004.

16.     Plaintiff further testified that from April 2005 through June 2005, he was subjected to routine cell inspections and compliance checks conducted by Officer John Macinnis, the unit correctional officer.  While plaintiff conceded that such inspections are both necessary and appropriate to ensure that inmates are not in possession of contraband and to provide for the safety of all individuals in the unit, he claims that the cell inspection was improperly motivated by certain negative comments regarding Correctional Officer Macinnis made during a discussion between plaintiff and his cell-mate, which Officer Macinnis purportedly overheard.  Plaintiff claimed to have mailed a letter and grievance to the Inspector General's Office in Carson City, Nevada, recounting the details of the cell inspection and presumably his suspicions of improper motive.

17.     On or about June 21, 2005, a notice of charges was issued against plaintiff by Officer Macinnis for improperly sleeping on his bed during a cell inspection.  Plaintiff testified that the issuance of the notice of charges was retaliatory conduct improperly motivated by the

comments overheard by Officer Macinnis and possibly the letter and grievance plaintiff forwarded to Carson City, Nevada, regarding the inspection of his cell.

18.     Plaintiff also testified that on or about July 6, 2005, plaintiff was issued a notice of charges for the improper solicitation of information regarding staff, namely Officer Macinnis, and causing a disruption/disturbance in the unit.  Plaintiff indicated that the charges stemmed from his attempt to obtain affidavits from other inmates, which he drafted or intended to draft in a lawsuit regarding the falsity of the charges filed against plaintiff by Officer Macinnis.

19.     Plaintiff testified that prior to the July 6, 2005, write-up, he had met with Celia Chacon, the unit caseworker who, after having received complaints from other inmates, directed plaintiff to cease and desist any further attempts to obtain affidavits from inmates regarding Officer Macinnis while Officer Macinnis was on duty.  Plaintiff refused to comply with Chacon's request, and met with Chacon, again, along with Officer Macinnis.  At that meeting, plaintiff was ordered, due to the disturbance that his conduct created amongst the other inmates in the unit, to stop any further attempts at obtaining affidavits in the unit while Officer Macinnis was on duty. Plaintiff was offered the alternative of obtaining affidavits on the yard or any other place outside of the unit, but maintained at trial that Chacon's and Officer Macinnis' directive to cease and desist his attempts to obtain the affidavits in the unit while Mr. Macinnis was on duty violated his right to access the courts.  Plaintiff further claimed a violation of his right to access to the courts when Chacon and Officer Macinnis prohibited any further correspondence with the Inspector General's Office in Carson City as it circumvented the grievance process, and in directing plaintiff to utilize the administrative regulations for complaints.  At the court's inquiry, plaintiff, who was concededly not a notary public, indicated that the affidavits were intended for use at trial, to which the court responded that such documents, even if appropriately drafted, were typically inadmissible at trial under the Federal Rules of Evidence.

7

20.     At the close of plaintiff's case in chief, defendants made an oral motion for judgment as a matter of law under Fed. R. Civ. P. 50(a)(1), requesting that the court enter judgment in favor of each defendant with respect to all claims pending at trial as plaintiff had failed to set forth a legally sufficient evidentiary basis upon which any reasonable jury would find in plaintiff's favor.

## CONCLUSIONS OF LAW

1.     Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion." Santos v. Gates, 287 F.3d 846, 851 (9th Cir. 2002).  In other words, a motion for a judgment as a matter of law is properly granted only if no reasonable juror could find in the non-moving party's favor.  El-Hakem v. BJY Inc., 415 F.3d 1068, 1072 (9th Cir. 2005).  The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party.  La Londe v. County of Riverside, 204 F.3d 947, 959 (9th Cir. 2000).  If conflicting inferences may be drawn from the facts, the case must go to the jury.  Id.

2.     The Eighth Amendment applies to the states through the due process clause of the Fourteenth Amendment, and prohibits the infliction of cruel and unusual punishment.  Robinson v. California, 370 U.S. 660, 666 (1962).

3.     In order to violate the Eighth Amendment proscription against cruel and unusual punishment, there must be a "deliberate indifference to serious medical needs of prisoners." Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1988)).

4.     Deliberate indifference involves both an objective and a subjective component. The objective component is met if the deprivation is "sufficiently serious."  The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834, 837 (1994).

1    5.    Deliberate indifference may be manifested in two ways.  It may appear when prison

2    officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the

3    way in which prison physicians provide medical care.  However, mere negligence in diagnosing or

4    treating a medical condition alone does not violate a prisoner's Eighth Amendment rights.

5    McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds, WMX

6    Techs. Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).

7    6.    Mere disagreements as to the proper diagnosis and treatment are not

8    constitutionally cognizable.  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

9    7.    Viewed in the light most favorable to him, and drawing all inferences in his favor, a

10   reasonable juror could not have found in plaintiff's favor regarding his claims of deliberate

11   indifference to his serious medical needs.  Plaintiff, himself, testified that he timely received all

12   necessary medications and received all necessary medical care on or about June 22, 2004, despite

13   the single, missed dosage of Prozac on that date, while the unit was in lockdown.  Further, plaintiff

14   conceded that he was systematically provided with the Prozac from admittance into the NDOC

15   system to the time of his discharge, with the exception of June 22, 2004, and November 29, 2004.

16   Moreover, not withstanding plaintiff's personal difference of opinion, plaintiff did not establish at

17   trial that the responses to his inquiries regarding the missed Prozac on June 22, 2004, that 1) one

18   missed dosage of Prozac was not a life threatening condition, 2) the missed dosage was clearly not

19   injurious to plaintiff's health, and 3) in light of such, the missed dosage would not be issued

20   pursuant to a make-up pill call was inadequate or not medically sound.  Nor did plaintiff present

21   evidence establishing that the missed dosage itself threatened his health.  Finally, plaintiff did not

22   present evidence concerning the security considerations during the lockdown, or the official

23   responses to his written grievances related to the missed dosages.

24   8.    Plaintiff also failed to prove deliberate indifference regarding his medical

25   complaints of missed medications on November 20, 2004, after his unit's lockdown status

26

9

beginning November 12, 2004.  As plaintiff testified, he was systematically provided with his medications (Prozac and Neurontin) during the preceding sixteen days before the missed dosage on November 29, 2004; he admitted to receiving the missed morning dosage of Prozac and Neurontin as morning and lunch pill calls were cancelled, but was administered the Neurontin during evening pill call that same night, and the Prozac, which plaintiff received once a day in the morning, on the following morning on November 30, 2004.  As with his deliberate indifference claims related to the missed dosage of Prozac on June 22, 2004, plaintiff presented no evidence indicating that the missed dosage itself threatened his health.  Nor would a reasonable jury find that the delayed dosage of Neurontin, under the conditions of the lockdown, would have shown deliberate indifference to plaintiff's serious medical needs.  At most, regarding the isolated missed dosages of his medication, plaintiff claimed a difference of opinion regarding whether such medical treatment was appropriate.  Finally, plaintiff did not present evidence concerning the security considerations during the lockdown, or the official responses to his written grievances related to the missed dosages.

9.      Nor would a reasonable juror find in plaintiff's favor regarding his claim that prison officials were deliberately indifferent to his serious medical needs as a result of the treatment, or non-treatment, rendered to plaintiff following the outbreak of his Shingles during September 2004.  Plaintiff testified that while his previous medical complaints were responded to, he was unhappy with the responses provided and his dissatisfaction with the responses caused him to stress, obsess, and become angry.  It was this self-induced stress, and unreasonable over-reaction to the handling of his medical complaints to which plaintiff, during trial, attributed his Shingles outbreak, not deliberate indifference of prison officials.

10.      Regarding plaintiff's claim that prison officials delayed in addressing his outbreak of Shingles, plaintiff testified that when he went to sick call the day of the outbreak, he was refused admission.  Plaintiff failed, however, to provide evidence as to the reason that he was not

seen at that time. Plaintiff further testified that on several occasions while he was waiting for an appointment to come through to see the doctor, he inquired of the CO about the appointment, and merely surmised that his requests were not being referred up the chain of command. Morever, plaintiff testified that he continued to inquire about why he was not initially seen at sick call during his scheduled medical appointment, but did not testify as to reasons given by the medical staff. Nor did plaintiff rely during trial on any other documentation or facts developed during discovery as to his failure to be initially admitted to sick call. Under these circumstances, plaintiff's speculations fail to establish that officials were deliberately indifferent to his serious medical needs when he was not initially admitted to sick call, or that officials did not properly respond to his requests or were made aware of any change of plaintiff's medical status from his initial report to sick call. Plaintiff also testified that responses to his grievances during that time period exhibited deliberate indifference. However, based on plaintiff's preclusion from presenting the responses to his grievances, his proof fails as to his claims for deliberate indifference of officials during the several-days' time period before he began receiving medical attention.

11.     Plaintiff testified that he ultimately forced prison officials to provide him medical attention by threatening to commit suicide by jumping off a prison tier, after which he was taken to the infirmary for medical evaluation. Plaintiff testified that he saw the doctor and received pain shots for several days in succession. After several days of pain shots, plaintiff testified that on one occasion he asked for an emergency grievance because his morning pain shot had worn off. Plaintiff testified that he was eventually taken to the infirmary, given a pain shot, and given the option of staying in the infirmary or returning to his cell. He chose to return to his cell, and was allowed to file an emergency grievance. Although plaintiff was not treated as he would have preferred during this course of events, he did receive pain medication and elected to return to his unit. He failed to establish deliberate indifference.

12. Plaintiff continued to be given pain medication for Shingles until he was seen at the prison clinic by Dr. Scott. Dr. Scott indicated that the medications plaintiff was receiving for his Shingles could potentially cause liver damage, and wrote a different prescription for plaintiff. However, the prison did not have the specified medication on hand, and had to order it. Plaintiff claims that the delay in getting the newly prescribed medication exhibited deliberate indifference. However, plaintiff presented no evidence establishing that the prison medical personnel deliberately delayed the receipt of the medication, or that the delay was not justified considering the potential liver damage had plaintiff continued with his original medication. Plaintiff presented no medical witnesses or evidence during his case. While plaintiff may have a difference of opinion about whether he should have been allowed to continue on his initial medication pending the receipt of the newly prescribed medication, such does not establish deliberate indifference.

13. A reasonable juror could not find in favor of plaintiff on his deliberate indifference claim related to prison officers not allowing him to sleep during cell check. Plaintiff testified that cell checks were proper at the prison. While plaintiff testified that no administrative regulation prohibits sleeping during such cell check, no reasonable juror would find that prison officials violated prison guidelines or were deliberately indifferent to plaintiff's physical needs by not allowing him to sleep during cell check. Moreover, plaintiff testified that when he attempted to get medical orders indicating that he should be permitted to sleep during the day, the medical staff made an accommodation by allowing him to receive medication later in the evening so that he could get a full night's sleep. Under those circumstances, plaintiff has not maintained a claim for deliberate indifference.

14. Of fundamental import to prisoners are their First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts. Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005). Without these bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices. Id.

15.     Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. Rhodes, 408 F.3d at 567-68. The prisoner plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995). The right of access to the courts is a right to bring petitions or complaints to federal court and not a right to discover such claims or even to litigate them effectively once filed with a court. Lewis v. Casey, 518 U.S. 343, 354 (1996).

16.     A reasonable juror would not find in plaintiff's favor regarding his claims of denial of access to the courts and retaliation. Plaintiff failed to show that the confiscation of certain photographs depicting his nude upper body were unauthorized or that they did not constitute contraband within the institution. Plaintiff conceded that cell inspections and compliance checks that are conducted to ensure that inmates are not in possession of contraband are necessary and appropriate as inmates should not be in possession of contraband. Furthermore, plaintiff conceded that the confiscation of contraband is appropriate to further penological goals of safety and security within the institution. Even if the confiscation of some of plaintiff's photographs was inappropriate, plaintiff was not damaged in his access to the courts claim because plaintiff introduced three photographs depicting his upper torso which plaintiff contends were taken at the same time and at the same place as the confiscated photographs, which were admitted into evidence as plaintiff's exhibit #1.

17.     Regarding plaintiff's claims of retaliation with respect to the notices of charges filed against him for failure to abide by applicable housing rules by sleeping during a cell inspection, plaintiff conceded that he was aware of the requirement that inmates be awake during

cell inspection, and did not show that he had properly documented a medical approval to sleep during the inspections to the unit officers and staff.  Furthermore, plaintiff conceded that the housing rule was appropriate and did not show that they were unsustainable as furthering penological goals of safety and security within the institution.

18.    Similarly, plaintiff failed to prove a retaliation claim as to the notice of charges based upon plaintiff's improper solicitation of information regarding staff and causing disruption and disturbance on the tier.  Plaintiff did not establish that the enforcement of those regulations was not justified by the prevention of disruptions in the unit, and the maintenance of organization in furthering the penological goals of safety and security within the institution.

19.    Nor would a reasonable juror find that plaintiff proved a retaliation claim regarding the order to cease his correspondence with the Inspector General's Office in Carson City, Nevada. Plaintiff was instructed to follow the proper inmate grievance process set forth in the administrative regulations, and has not established that such a process is not the appropriate mechanism for pursuing prison grievances.

20.    Finally, plaintiff failed to prove the absence of legitimate correctional goals for his claims that he was prohibited from soliciting affidavits from other inmates to document his treatment.  Plaintiff testified that he was instructed pursuant to prison guidelines and in the interest of security not to solicit statements from other inmates regarding correctional officers during those officers' shifts.  As plaintiff's testimony indicated, his claims against correctional officers for conducting allegedly retaliatory cell checks were based on his suspicions, and were not an improper exercise of prison authority.

/ / /

/ / /

/ / /

/ / /

14

**<u>ORDER</u>**

Based on the above Findings of Fact and Conclusions of Law, the arguments of the parties and the evidence presented by plaintiff at trial, that defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) is GRANTED.

Dated this 20 day of December, 2010.

_____
Lloyd D. George
United States District Judge

15